OPINION OF THE COURT
Bruce M. Kaplan, J.
How to reconcile a custodial parent’s right to determine her child’s religious upbringing with the noncustodial parent’s right to free exercise of religion when the child is visiting with him, is the task confronting the court in these cross petitions for visitation and custody. S. E., now S. E. L., was divorced from James W. (J. W.), in March 1987. Divorce did not attenu *456 ate their acrimonious relationship and she soon initiated litigation in Family Court with respect to J. W.’s visitation with their daughter Natalie. In November 1987, J. W. cross-petitioned for custody.
Numerous attempts were made to resolve the issue by Judge Gallet. The ultimate sticking point was the extent to which J. W. could involve Natalie with Jehovah’s Witness doctrine, religious services, activities and teachings.
J. W.’s petition for custody is denied. Accordingly, custody of Natalie, which was granted to S. E. L. in the judgment of divorce, will remain with her.
J. W.’s petition for modification of custody, brought less than a year had elapsed since the judgment of divorce, is a thinly disguised ploy to obtain leverage with respect to his demands for visitation. Since his petition is utterly lacking in merit it is dismissed.
We next turn to a consideration of not only the amount of visitation that should be awarded J. W., but also what restrictions, if any, should be placed upon his ability to expose his daughter to his religion.
We shall do so by focusing on the following issues: (1) What are the rights and responsibilities of the custodial parent with respect to a child’s religious training? (2) To what extent are those rights and responsibilities abridged by a noncustodial parent’s First Amendment right to the free exercise of his or her religion when enjoying visitation with his or her child?
The court will attempt to resolve these salutary, and ofttimes conflicting objectives in the context of the best interests of the child.
A CUSTODIAL PARENT HAS THE RIGHT TO DETERMINE THE child’s RELIGIOUS UPBRINGING AND TRAINING.
New York law has consistently held that the custodial parent has the right to determine a child’s religious upbringing and training.
The following cases illustrate how this right is subject to State regulation and State protection.
In Weinberger v Van Hessen (260 NY 294), the Court of Appeals, in 1932, held that a child’s religious education should be determined by the custodian. In determining that a cause of action in equity was stated, it noted that it is proper, on occasion, to make a decree of partial custody including the right of religious education according to the views of the *457 custodian. While this case did not involve a dispute over religious upbringing between parents in the context of a custody proceeding, it nonetheless recognized a right and responsibility accruing to a guardian.
In People ex rel. Sisson v Sisson (271 NY 285), the Court of Appeals held that it was improper to intervene in a dispute between parents with respect to the child’s education. It noted that a "[d]ispute between parents when it does not involve anything immoral or harmful to the welfare of the child is beyond the reach of the law.” (Supra, at 287.) The court cannot regulate by its processes the internal affairs of the home.
Since this case involves an intact family, it is of little precedential use.
In People ex rel. Portnoy v Strasser (303 NY 539) the Court of Appeals reversed the granting of a writ of habeas corpus to the child’s grandmother against her custodial parent.
The court dismissed the writ, and rejected the grandmother’s argument that the child was not being trained in the Jewish religion, or any religion. It held that the choice of whether to train a child in the faith of her father’s is within the parent’s sole control.
It concluded that there was no proof of neglect as would authorize any court to take an infant from its mother, or interfere in the internal arrangements of family life.
In Diemer v Diemer (8 NY2d 206) the court affirmed the grant of custody to the wife where the husband had claimed that his wife, a Catholic, had violated a prenuptial agreement to raise the child as a Protestant. It affirmed a trial court finding that no such agreement existed. It noted that, absent such agreement, the wife’s decision to bring up the child as a Catholic was not grounds to change custody. This decision can be cited for the proposition, that absent an agreement with respect to religious upbringing, the custodial parent has the right to determine the choice of the child’s religion.
In his concurring opinion in Weiss v Weiss (52 NY2d 170), Judge Meyer also noted that a custodial parent has a right to determine a child’s religious education absent controlling contrary provisions in the separation agreement.
We next turn to a consideration of the extent to which an order of visitation may constitutionally abridge a noncustodial parent’s right to free exercise of his or her religion.
A COURT ORDER WHICH ADVERSELY IMPACTS A NONCUSTODIAL *458 parent’s free exercise of his or her religion would be an UNCONSTITUTIONAL INFRINGEMENT OF FIRST AMENDMENT RIGHTS WHEN BASED ON AN ASSESSMENT OF THE MERITS OF HIS OR HER RELIGION.
The right to free exercise of religion guarantees that a court will not make, inter alia, a custody decision, based on its view of the respective merits of two religions. It further guarantees that a noncustodial parent’s right to practice his or her religion will not be abrogated when the child visits except to the extent necessary to prevent any harm to the child.
In Aldous v Aldous (99 AD2d 197 [3d Dept 1984]) the court noted that, while religion may be considered in determining a child’s best interest, it is inappropriate to make a custody award based on religion alone. Religious beliefs are to be considered when a child has developed religious beliefs that can be better served by one parent than another, or if the religion violates State law, or poses a risk to the child’s well-being.
In Matter of Bentley v Bentley (86 AD2d 926 [3d Dept 1982]) the court affirmed Matter of Margaret B. v Jeffrey B. (106 Misc 2d 608 [Fam Ct, Warren County 1980]). The Family Court had determined that the custodial parent was the proper regulator of the child’s religion, that the court would not generally interfere unless mandated by a clear need to protect a child, that the child’s best interest dictated that the child be reared in one religion, and absent agreement that determination must be left to the custodial parent.
The Appellate Division noted that the Family Court’s order prohibiting a Jehovah’s Witness father from instructing the child in Jehovah’s Witness teaching, and taking him to Jehovah’s Witness religious and social activities was proper because there had been demonstrated harm to the child. It noted that it would be improper in the absence of such demonstrated harm.
The harm found to exist emanated from the children being emotionally strained and torn because of the parties’ conflicting religious beliefs, and not from any judicial evaluation of the relative merits of Jehovah’s Witness doctrine, and that of the custodial parent’s Catholic faith.
The basis of this decision is grounded not in any assessment of the respective worth of Catholicism vis-á-vis Jehovah’s Witness, but because the conflict which arose from differing religious beliefs had an adverse impact on the children, and the court wished to ameliorate it.
*459 The purpose of the prohibition was to avoid conflict which had rendered the children emotionally strained and torn, and not on any judicial denigration of the validity of Jehovah’s Witnesses teachings. The only way that this harmful situation could be obviated was to allow the custodial parent to determine the religious upbringing.
In Gruber v Gruber (87 AD2d 246 [1st Dept 1982]) the court was called upon to enforce a separation agreement which provided that the child, born to persons of different religions, would attend a Yeshiva, or a school providing Jewish religious training. In directing that this agreement be adhered to, the court noted that where a person breaches a separation agreement provision respecting religious training, that parent must demonstrate that adherence is detrimental to the child’s best interest.
In Stevenot v Stevenot (133 AD2d 820 [2d Dept 1987]) the court held that absent a specific agreement the custodial parent is the proper party to determine the children’s religious training.
It did so in the context of holding nugatory an alleged oral agreement to raise the parties’ children in the religious faith of the Congregational Church. It noted that the only agreements between divorcing spouses that would be upheld by the courts are those incorporated into separation agreements, court orders or signed stipulations.
It went on to hold that since no such agreement existed, the custodial parent is the proper party to determine the children’s religious training.
In Spring v Glawson (89 AD2d 980 [2d Dept 1982]) the court enforced a provision contained in the stipulation of settlement, incorporated but not merged into a judgment of divorce, which provided that the child should have no religious upbringing without the express written consent of both parties.
It rejected the custodial parent’s argument that the child should be enrolled in a Catholic parochial school which, not only was located one block from her residence, but which offered a superior educational opportunity for her son.
The court noted ”[a]s a matter of policy, the initial posture of the courts with respect to the religious upbringing of a child should be one of noninterference (Matter of Paolella v Philips, 27 Misc 2d 763). The determination of that matter is best left to the child, if of sufficient age and intelligence, [the] agreement of the parents or, where there is no agreement, to *460 the custodial parent (see Matter of Paolella v Philips, supra; see, also, Martin v Martin, 308 NY 136; Mester v Mester, 58 Misc 2d 790).” (89 AD2d, supra, at 981.)
The court went on to note that courts have consistently upheld the validity of agreements relating to the religious and moral training of a child. It further noted that before the court would interfere with the carrying out of such an agreement "the burden is on the party seeking to modify or avoid the agreement to demonstrate that enforcement will not be in the best interest of the child”. (89 AD2d, supra, at 981.)
Bentley (supra) is the only case in New York which has focused on the interplay of the noncustodial parent’s First Amendment rights, and those of the custodial parent to determine the child’s religion. It did not involve a separation agreement.
Gruber v Gruber (supra) and Spring v Glawson (supra) both dealt with separation agreements, and held that such agreements were entitled to enforcement by the courts. They further held that if a party wished to avoid or modify such an agreement he or she bore the burden of proving that enforcement would not be in the children’s best interests.
A synthesis of these holdings leads to the conclusion that J. W. has the burden of proving that denying him the right to expose Natalie to Jehovah’s Witness training would not be in her best interests.
That burden falls upon him because of the procedural posture in which the matter comes before this court. J. W. agreed in the stipulation of settlement, incorporated but not merged into the divorce judgment, that S. E. L. would have absolute custody and exclusive supervision, control and care of Natalie.
This agreement is so pervasive in its reach as to be functionally indistinguishable from Gruber, Spring and Stevenot (supra).
Since J. W. now wishes to abrogate this agreement he bears the burden of showing that enforcing it will not be in Natalie’s best interests.
While the court is sensitive to J. W.’s First Amendment claim, the situation is further complicated because rights of constitutional dimension can be freely waived. When J. W. agreed S. E. L. should have "exclusive supervision, control and care” of Natalie he waived his right to the "free exercise” of his religion when Natalie visited with him. He assumed the *461 onus of demonstrating that allowing him to expose Natalie to his religion would not be harmful to her.
After considering the evidence the court concludes that J. W. will be permitted to take Natalie to Jehovah’s Witness services on Sunday but shall not involve her any further except that he may answer casual questions which she might ask him. No other exposure to Jehovah’s Witness doctrine and activities will be permitted because it has, and could lead to the kind of strain and conflict enjoined in Bentley v Bentley (supra).
The conclusion that any more extensive participation w;ould be harmful to Natalie turned almost entirely on an evaluation of the parties’ credibility.
The court finds J. W. less than credible. This conclusion is based on observation of his demeanor, his denial to Dr. Dudley of the violent incidents toward S. E. L. which furnished her grounds for divorce because of his cruel and inhuman treatment, and Dr. Dudley’s finding that J. W. was less credible than S. E. L.
It is highly significant that although J. W. testified that he was amenable to Natalie being exposed to both faiths, Natalie revealed that he told her that he "doesn’t want her studying Catholicism, but wishes her to study what he’s studying”.
Dr. Dudley further noted that Natalie was placed under such strain by her parents’ conflict (which centers around religion) that it inhibited her ability to talk to either of them.
Finally, Dr. Dudley reported that subsequent to their meeting, Natalie called him twice. The first call, made from her mother’s home, was for the purpose of reaffirming her position that she wished to study the religions of both her parents.
The second call was made from J. W.’s home. She stated that she wished to study the Jehovah’s Witness religion, and that the only way she could do this would be to move in with her father, and accept their faith.
I find this an unmistakable indication of J. W.’s overreaching. It reinforced Natalie’s interest in the Jehovah’s Witness religion by taking advantage of her youth and lack of insight, by subjecting her to undue pressure.
J. W.’s counsel has presented a resourceful well-written and comprehensive brief. Its thoroughgoing analysis of First Amendment principles has meager relevance to the factual context of this proceeding. The court has little or no disagreement with the cases cited and the principles expounded; but *462 they are generally inapposite. Although there is an exhaustive analysis of the law of other jurisdictions and Federal law, there is too little reliance on the common law of this State. This court, as a court of original jurisdiction, is bound to follow the precedents of the higher courts of this State. And to the extent that they compel results different than the cases, treatises and articles cited in the petitioner’s brief, New York common law will control.
Moreover, this proceeding involves an existing custody order which was based on the parties’ agreement. The original determination in Rockland County Supreme Court was devoid of any consideration of the relative merits of the parties’ religions. Nor has that issue been presented, let alone considered, in this forum.
This decision is based on Natalie’s best interests. It would have been the same if J. W. were the custodial parent. His right to bring up Natalie as a Jehovah’s Witness would have been honored, and S. E. L. would have shouldered the burden of demonstrating that it would not be harmful to Natalie for her to be exposed to Catholicism.
VISITATION
The testimony established that problems arose from the twice-weekly visitation that had been temporarily ordered, now that Natalie lives in Yonkers.
Accordingly, Wednesday visitation is eliminated. In its stead J. W. is awarded an additional four consecutive days in both Natalie’s Christmas vacation and spring vacation. The existing provisions respecting weekly Monday visitation, alternate weekends, holidays and two weeks in the summer remain unchanged.
CONCLUSION
The right to free exercise of religion requires that a custody decision will not be made because a court has determined the respective merits of two religions. It further guarantees that no limitation will be placed on a noncustodial parent’s right to practice his or her religion when the child visits except to the extent necessary to prevent any harm to the child.
It is one thing to grant the custodial parent the right to determine Natalie’s religion. It is quite another to allow her, in furtherance of that right, to prohibit any exposure to her father’s faith.
*463 While S. E. L. has the right to determine Natalie’s religion, that right does not permit her to enjoin the child from having the limited exposure to her father’s religion permitted under this decision.