OPINION OF THE COURT
David B. Saxe, J.
The issue that I am asked to resolve in the context of this custody proceeding involving six-year-old twin boys is as follows: whether the de facto custodial parent (the mother) may determine the children’s religious upbringing by enrolling them in a Reform Jewish school against the wishes of the noncustodial parent (the father), who wants the children to be educated at a Conservative synagogue.
*199 The mother, who works at a New York City law firm as a paralegal, and the father, a physician, were married in a Reform ceremony. During their marriage, they did not maintain a kosher home and attended religious services only on the Jewish high holidays when they worshipped at a Conservative synagogue, because the husband’s uncle obtained tickets for them at no cost.
Mrs. G. told me that she was raised in a Reform environment and has implied that ordering a more observant education for the boys would place a strain on her relationship with them because she could not easily participate in their Hebrew schooling.
Dr. G. has told me that since he and his wife physically separated, due primarily to his acknowledgment of his homosexuality, he has become more firmly attached to a more traditional form of Judaism, adhered to by him before his marriage.
Unable to resolve this seemingly ancillary issue, the parties have requested a resolution by the court.
There is no lack of authoritative and persuasive case law concerning the matter at hand. The law in New York is well settled that in disputes involving children, the court is bound to make its determination solely upon what is in the best interests of the children (see, Matter of Lincoln v Lincoln, 24 NY2d 270 [1969]; see also, Friederwitzer v Friederwitzer, 55 NY2d 89 [1982]).
As a matter of policy, however, the initial posture of the court with respect to the religious upbringing of the children of divorced parents should be one of noninterference, absent a showing that " 'moral, mental and physical conditions are so bad as seriously to affect the health or morals of [the] children’ ” (Spring v Glawon, 89 AD2d 980, 981 [2d Dept 1982]; Siegel v Siegel, 122 Misc 2d 932 [Sup Ct, Nassau County 1984]). Moreover, where there is no evidence of a writing by the parties either in a separation agreement, stipulation or court order, nor any compelling circumstances suggesting the unfitness of the custodian or a clear need to protect the children from some demonstrable harm, the custodial parent has almost an absolute right to determine a child’s religious upbringing and training (see, De Beer v De Beer, 162 AD2d 165 [1st Dept 1990]; De Arakie v De Arakie, 159 AD2d 346 [1st Dept 1990]; Stevenot v Stevenot, 133 AD2d 820 [2d Dept 1987]; Siegel v Siegel, 122 Misc 2d 932, supra; Mester v Mester, 58 *200 Misc 2d 790 [Sup Ct, Nassau County 1969]; Matter of Paolella v Phillips, 27 Misc 2d 763 [Sup Ct, Suffolk County I960]; cf., Matter of Grayman v Hession, 84 AD2d 111 [3d Dept 1982] [order directing custodial parent, a nonobservant Catholic, to enroll child in Hebrew school is in best interests of child because custodial parent had consented and acquiesced to Jewish religious training since child’s birth]).
In this case, there is no agreement between the parties concerning the manner of the children’s religious upbringing. Furthermore, there is no evidence that the de facto custodial parent is unfit or that the children’s physical, mental, or ethical condition is in immediate peril. It would be inappropriate here for the court to apply its own judgment concerning the relative value of Reform Judaism vis-á-vis the Conservative branch of Judaism (see, Matter of S. E. L. v J. W. W., 143 Misc 2d 455 [Fam Ct, NY County 1989], citing Matter of Bentley v Bentley, 86 AD2d 926 [3d Dept 1982]; Siegel v Siegel, 122 Misc 2d 932, supra [Supreme Court has no jurisdiction to determine religion in which child should be reared]). Therefore, in accordance with significant precedent, the court will not interfere with the de facto custodial parent’s decision to raise the children as Reform Jews (see, De Arakie v De Arakie, 159 AD2d 346, supra [de facto custodial parent’s decision to enroll children in a Conservative Jewish school not interfered with notwithstanding the parties’ indication of desire during marriage to rear children as Orthodox]; see also, De Arakie v De Arakie, 172 AD2d 398 [1st Dept 1991]).
The court, nevertheless, recognizes the unique circumstances of this case, and, as a result of its independent research, has arrived at a solution.
In all but one of the cases cited above, the issue concerned a conflict between two different religions or two severely disparate denominations of one religion. This case, however, involves merely a sectarian dispute between the two most corresponding branches of the same religion. ”[I]n recent years, the way of life of most Conservative Jews has been gravitating toward that of most Reform Jews. Similarly, Reform Judaism is moving toward more ritual practices in its synagogue services and in the observance of the holy days[.] What is developing today [is] a closer coalescence of [the] non-Orthodox branches of Judaism * * * in ritual practice and even in ideology” (see, Rosenberg, The Concise Guide to Judaism: History, Practice, Faith, 143-144 [NAL Books 1990]).
*201 Furthermore, since the adoption of the "Columbus Platform” in 1937, American Reform Judaism has accepted the substantial role that traditional observance plays in preserving the unity of the Jewish people (Kelal Yisrael) as well as in Jewish survival itself. The "Columbus Platform” states: "Judaism as a way of life requires, in addition to its moral and spiritual demands, the preservation of the Sabbath, festivals, and Holy Days, the retention and development of such customs, symbols, and ceremonies as possess inspirational value, the cultivation of distinctive forms of religious art and music, and use of Hebrew, together with the vernacular, in * * * worship and instruction” (14 Encyclopedia Judaica Jerusalem, at 26-27 [Keter Publ House 1971]). Concededly, there are various groups within the Reform movement, avowedly secular and humanist, that generally eschew the traditional, cultural aspects of Judaism; however, Congregation Rodeph Sholom, the congregation and religious school with which the de facto custodial parent seeks to be affiliated, is openly traditionalist in many regards. For example, Hebrew is used substantially in services as well as being taught in the school. Also, the yarmulke is generally worn by most of the Congregation’s members. Furthermore, the Congregation’s Senior Rabbi, Robert N. Levine, has stated that a "deep respect for * * * other branches of Judaism” is imparted and fostered at Rodeph Sholom. So, notwithstanding the doctrinal differences between Reform and Conservative Judaism, there appears little to suggest that the children are being "emotionally strained and torn because of the parties’ conflicting religious beliefs” (see, Matter of S. E. L. v J. W. W., supra, 143 Misc 2d, at 458 [Fam Ct, NY County 1989], citing Matter of Bentley v Bentley, 86 AD2d 926, supra).
Since matters involving religion often form a profound part of a child’s cultural heritage as well as moral foundation, where there is no real conflict between the parents’ religious beliefs, the child’s best interests are eminently served by allowing the noncustodial parent to take an active role in the child’s religious experience.
Here, the noncustodial parent is not motivated merely by a reflexive opposition, but instead, a sincere desire that the children inherit the richness of traditional Judaism. I sympathize with the noncustodial parent’s singular dilemma and respect his genuinely rekindled passion for Jewish tradition as well as his personal conviction that homosexuality and Conservative Judaism are not incompatible. Therefore, I hold that *202 the mother, as the de facto custodial parent, has the right to determine the place and manner of the children’s religious training, but the father should be permitted during his visitation periods to engage in the traditional activities and cultural aspects associated with Conservative Judaism, such as taking the children to Congregation Ansche Chesed (the Conservative Synagogue with which he is affiliated), keeping a traditional Shabbat or observing the second day of holidays with the children as long as no attempt is made to indoctrinate the children with any purely theological or ideological dogmas, principles or beliefs that are unacceptable to the Reform movement as practiced at Congregation Rodeph Sholom (see, Matter of S. E. L. v J. W. W., 143 Misc 2d 455, supra [although noncustodial parent permitted to take child being raised as a Jew to Jehovah’s Witness services, he would not be allowed to involve child any further except to answer child’s casual questions; no other exposure to Jehovah’s Witness doctrine and activities permitted because it could lead to strain or conflict harmful to child]).
As the court has no desire to enmesh itself in or even to create an artificial tension between the parents’ respective religious beliefs, by recognizing the de facto custodial parent’s absolute right to raise the children as Reform Jews, while further permitting the noncustodial parent to freely and comfortably practice Conservative Jewish religious and cultural traditions with the children, the best interests of the children are amply served.