Isaac Perlstein, Appellant, v Rae Perlstein, Respondent.

First Department, July 3, 1980

**APPEARANCES OF COUNSEL**

*Nathan Lewin* of counsel *(Miller, Cassidy, LaRocca & Lewin; Steven H. Thall,* attorneys), for appellant.

*Raoul Lionel Felder* for respondent.

OPINION OF THE COURT

SULLIVAN, J.

At issue is, *inter alia,* a parent's obligation to abide by the child custody terms of a separation agreement regarding the religious upbringing of a child.

In 1971, the parties, 20 years of age and members of the Chassidic Jewish community, were married. In February, 1973 a son was born. Evidently, differences over religion and other matters developed, and the wife opted for a less orthodox lifestyle. On January 14, 1975, the parties signed a separation agreement giving custody of the child, not yet two years of age, to the mother, subject to specified terms which would assure that he was raised and educated as an Orthodox Jew. A judgment of divorce continuing the provisions of the separation agreement was obtained in the Dominican Republic in February, 1975, and provided that the separation agreement was to "survive [the judgment] in the form established by the laws of the place where the document was signed."

The separation agreement was explicit at several points that if the mother violated certain provisions relating to the child's religious upbringing, custody would revert to the father:

"27(a) The wife while residing in New York shall send the child to Atheres Torah Vadaat or Chasam Sofer before the age of fourteen years. Should child not attend above schools except for reasons which prevent him from attending all schools, custody shall revert to father * * *

"If the Wife moves her residence for reasons of remarriage she shall, nevertheless, send the child to a Yeshiva similar in character and quality to Torah Vadaath or Chasam Sofer, otherwise custody reverts * * *

"30. TYPE OF FOOD SERVED AT HOME.

"The Wife agrees to strictly limit the food served at home according to Jewish dietary laws. Her continuous violation of this paragraph shall immediately revert the custody of the child to the Father."

By her own admission the mother "abandoned practically all of the ritualistic and fundamentalistic aspects of the Orthodox religion" approximately four or five months after the divorce. She gave up "Kashruth"—the keeping of the dietary laws—and failed to keep a kosher home.

Initially, the mother appears to have complied with the

terms of the separation agreement as they related to the child's schooling. In both September, 1976 and September, 1977 she enrolled him in the nursery of one of the religious schools designated in the agreement. Because the child developed behavioral problems she removed him, however, after "investigating into different schools", and enrolled him in a public school without the knowledge of his father. For the after school hours, she enrolled him in a YMHA which, instead of being a school facility wherein the child "received religious training", as the mother originally contended, offered activities such as woodworking, painting, pottery and sports.

During the summer the child was sent to a nonorthodox camp and brought by his mother to a nonkosher dude ranch, despite explicit provisions in the separation agreement requiring his attendance at "a camp similar to the Hadar Torah or Shalva Camp." As noted by the father this clause, initialed by both of the parties, was a handwritten substitute for a provision which would have allowed them jointly to select a camp.

In August, 1978 the father petitioned for custody because of the mother's violations of the separation agreement, as well as his discovery of conduct assertedly demonstrative of her unfitness. After a trial the court dismissed the petition because it believed that the best interests of this child would be served by remaining with his mother. "Although the respondent does not adhere to the strict tenets and ritual of the Orthodox Hebrew faith as observed in the Chassidic community, in contravention to the terms of the separation agreement, nevertheless, the child is being raised in the Hebrew faith. There is no evidence of any potential harm to Tommy by his not receiving an Orthodox, Chassidic education. This Court would be justified in changing custody for reasons of religion only if the child's condition with his mother was 'so bad as seriously to affect [his] health or morals' *(People ex rel. Sisson v. Sisson,* 271 NY 285, 288)." The court declared the mother to be the "sole custodian" and awarded her counsel fees. This appeal resulted.

The linchpin of the father's argument is that the court wrongly ignored the separation agreement's provisions for the child's religious upbringing, and that the issues at trial were clouded by attacks on Chassidism to the point where the mother's unfitness was ignored. In support of the latter argument he points to the mother's answer which alleged, *inter alia,* that the father's application manifested "a desire to

imprison the child of tender years within a rigid, restrictive, arbitrary and minority cult of religious practices which are harmful to the child and detrimental to his physical and mental development and well-being."

In an affidavit filed in this proceeding the mother expanded on this theme, speaking of her former husband's "rigid, archaic and frightening religious obligations" and charging that it was his "desire, as well as the desire of his cronies * * * to restrict the child's development within the rigid confines of ultra-orthodox practices." Since the focus of the mother's case was a denunciation of Chassidic customs and rituals, this rhetoric was carried over into the trial. For instance, in his opening the mother's attorney stated: "What we will show is that she has become and this is a quote, 'a traitor' because she left this sect. The sect is not really a sect as will be shown, it is more of a cult. It is an ancient, primitive, ignorant, bizarre offspring of even the Hassidic or Jewish religion. They burn the Israeli flag this particular sect, and what has happened here is that they have to capture back one of those who is now strayed from the fold, and in so doing they have to pillory this woman because she left this sect because she is a traitor. That is what it is all about, and that is what the evidence is going to show."

At the outset we note that the separation agreement does not contain a single provision requiring that the child be raised according to Chassidic tradition—it specifies only the degree of observance required of all Orthodox Jews. Nor does it require the child to attend Chassidic schools. The two schools specified are Orthodox Yeshivas.

Central to our determination is whether the separation agreement has been breached and, if so, the effect of such breach on custody. These issues must be considered within the framework of the overriding concern for the child's best interests. Needless to say, a custody proceeding should not deteriorate into a war between parents to establish the superiority of different life-styles.

That parents may contract to have their children brought up in observance of a certain religious life-style is well established in this State.[1] (See *Weinberger v Van Hessen,* 260 NY 294; *Matter of Kananack,* 272 App Div 783.) In *Weinberger*

---

1. Not all jurisdictions recognize the constitutionality of such agreements. (See *Hackett v Hackett,* 78 Ohio Abs 485.)

*(supra,* p 298) the Court of Appeals observed, "Agreements between parents for a particular sort of religious upbringing have in general been held valid in this country." "Courts will, as a general rule, enforce an agreement between a husband and wife regarding custody of children so long as the agreement is in the best interests and welfare of the children." *(Sheets v Sheets,* 22 AD2d 176, 178.)

The thrust of the custody provisions of the separation agreement, and seemingly the pre-eminent concern of the father at the time of its execution, was that the child be brought up in the teachings of Orthodox Judaism, with its time-honored sense of customs and values. Indeed, the commitment to provide the child with a certain religious upbringing was sufficiently imperative to the father that custody was to revert to him in the event the child was not raised according to orthodox precepts.[2]

It is clear that the mother committed herself, no matter what her personal religious inclinations, to raising the child in the orthodox tradition which the father cherished, even to the extent of how the child would spend his summers: "10 * * * (c) The Father shall pay for the child's summer camp; child shall he sent to a camp similar to the Hadar Torah or Shalva Camp." It is also obvious that the mother did not misapprehend the scope of the task to which she had committed herself, since she was raised as a Chassidic Jew, and differences over religion were the apparent causes of the disintegration of the marriage.

The mother testified that she was represented by counsel when she signed the separation agreement, and that she fully understood it and agreed to its terms. In fact, her attorney stipulated at trial that she understood, knew, and violated the terms of the agreement. As the testimony disclosed, the mother, within months of the separation, apparently disassociated the child from the way of life to which she had voluntarily committed him. Nothing in the agreement permitted the mother the unilateral discretion either to ignore or repudiate its terms. The agreement reflected a deliberate acknowledgement on her part that it was in the best interests of the child that he remain in her custody so long as she was able to raise him as an Orthodox Jew.

---

2. Whether the provision for reversion offends public policy is an issue we need not reach.

■ Thus, Trial Term's finding that the child was being raised in the Jewish faith did not settle the issue since it ignored the father's contention that the mother had failed to live up to the provisions of the agreement concerning the child's religious upbringing. From his perspective any religious observance other than one according to the strict tenets and ritual of Orthodox Judaism was unacceptable. Nor is the finding that the child had adjusted well to the nonorthodox life-style his mother fostered dispositive. When neither party has a special claim or right to custody, the well-being of the child is the sole denominator of his best interests. But, when, as here, the parties have agreed upon an appropriate standard of religious upbringing, both interests, the child's and the parents' as regards his moral and religious training, must be weighed and, where possible, reconciled. Thus, in the circumstances of this case, the principle adopted by Trial Term that a change in custody is justified only if "conditions are so bad as seriously to affect [the child's] health or morals" (see *People ex rel. Sisson v Sisson,* 271 NY 285, 287-288) is not controlling.

A crucial issue at trial was the mother's justification for removing the child from a designated religious school, in contravention of the terms of the agreement. Placing "considerable weight" on the testimony of a purported child psychologist, actually a play therapist, Trial Term found that the mother's action was an appropriate response to the child's behavioral problems. The existence of such problems is, of course, significant in any judicial assessment of the child's best interests. But it seems to us that what was ignored was compelling evidence which suggested that the reason for the child's maladjustment at school was the mother's failure to provide a kosher home and to raise him according to the tenets of Orthodox Judaism. For instance, at trial the mother testified that the child started complaining to her after the beginning of his second year at religious school: " 'I don't like my school, my teachers are telling me I shouldn't watch TV, they tell me I shouldn't listen to you, then they say I am not allowed to go to MacDonald's, not allowed to put on the light on Sabbath, and you do it. Are you Jewish? My teachers say you are not Jewish because you do these things and the children don't want to play with me' ". Thus, the disruption in the child's school life was due not so much to the stress of orthodox observance in a nonorthodox world, as the mother suggests, as it was to the conflict between the orthodoxy of the

only outside world the child knew, i.e., school, and the nonorthodoxy of his homelife. The resulting confusion and uncertainty were inevitable.

A child living in a modern urban society, exposed to a diversity of mores and cultures, may not be so ready or able to accept the orthodox ways of life, especially if he is readily offered what appears to be a more alluring alternative. Certainly he is confronted with enough temptations in his formative years without the added burden of having to reconcile a difference in values between his parents.

■ For that reason the preference of this child, expressed at the age of six, to live with his mother, is entitled to little or no weight. (See *Matter of Nehra v Uhlar,* 43 NY2d 242.) We question the value of any choice a child of such tender age might make, although we are not unaware that courts have placed some reliance on the wishes of children older than this child. (See, e.g., *Martin v Martin,* 308 NY 136; but see *Matter of Ehrlich v Ressner,* 55 AD2d 953, 954; *Eylman v Eylman,* 23 AD2d 495.)

■ Finally, in holding that the father "has the burden to demonstrate that a change of custody is warranted by a material change of circumstances affecting the welfare of the child" Trial Term misplaced the burden of proof. The mother was obliged to show that the observance of the religious guidelines specified in the separation agreement was detrimental to the child, since it was the father who sought to uphold the terms of the separation agreement, and where "the rights of the parents are involved, the question of custody is controlled by the separation agreement". *(People ex rel. Selbert v Selbert,* 60 AD2d 692, 693.)

From the foregoing, it is obvious that a new trial is required. We recognize, of course, that, at his present age, seven years, and considering the mother's exclusive custody for the past five years, it may well be too late to enforce religious orthodoxy on the child and that a change in custody from the mother to the father would be more harmful than helpful. (See *Aberbach v Aberbach,* 33 NY2d 592.) But this is an issue which, if explored at all, was not addressed by Trial Term.

Our hope is that at the retrial, not only will all the viable issues be presented, but also that any irrelevant arguments will be omitted. Diatribes against the religious beliefs and rituals of the father do not serve to enhance the search for

truth. Instead they only obscure the true issues, inflame emotions, and insult those many thousands of Jews who ardently immerse themselves in Chassidic orthodoxy. The court "is not [merely] adjudicating a controversy between adversary parties", and its function to act "as *parens patriae* to do what is best for the interest of the child" (see *Finlay v Finlay,* 240 NY 429, 433, 434) is hardly served by heated and tasteless attacks intended to denigrate a party.

Insofar as the mother's fitness was challenged for reasons other than her failure to comply with the custody provisions of the separation agreement, we are not, on this record, disposed to disturb Trial Term's findings of fact.

One issue remains. The father cites as error the failure of the court to hold a hearing on his motion to disqualify the mother's counsel. An associate of the mother's counsel, at a time she was employed in another firm, had interviewed the father regarding this action when he sought the firm's services. The mother's counsel denied having any conversations with his associate regarding her interview with the husband, and denied even that he was aware of the previous lawyer-client relationship.

No rigid formula exists by which to establish the necessity for a hearing in instances where an attorney's disqualification is sought on grounds of conflict of interest, but we do not believe the court abused its discretion here, since it was apparently convinced of the veracity of counsel's representations and saw no possibility of prejudice to the father.

Accordingly, the order and judgment, Supreme Court, New York County (KLEIN, J.), entered March 21, 1979, which, *inter alia,* dismissed the father's petition, declared the mother to be the sole custodian of the child, and awarded her counsel fees, should be modified on the law, without costs or disbursements, the declaration vacated, the petition reinstated, and the matter remanded for a new trial.

FEIN, J. P., LUPIANO, BLOOM and CARRO, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on March 21, 1979, modified, on the law, without costs or disbursements, the declaration vacated, the petition reinstated, and the matter remanded for a new trial.