CHARLES GRUBER, Respondent, v ESTHER GRUBER, Appellant.

First Department, June 10, 1982

APPEARANCES OF COUNSEL

*Esther Gruber Ungar*, appellant *pro se.*

*Charles Gruber,* respondent *pro se.*

### OPINION OF THE COURT

FEIN, J.

The parties were married in 1967, separated in 1974, and divorced in 1975. Both have since remarried. Plaintiff now resides in West Orange, New Jersey, while defendant has remained in New York City. The parties have two sons, who are now 13 and 12 years of age.

The original separation agreement in 1974, giving custody of the children to defendant former wife with visitation rights to plaintiff former husband, contained the following key provisions in paragraph SEVENTH with regard to the education of the children:

"(a) All important decisions relating to the education, health and welfare of the CHILDREN shall be the subject of joint consultation between the parties.

"(b) The parties agree that the CHILDREN shall attend a yeshivah or school providing Jewish religious training until the completion of the 12th grade. HUSBAND agrees to pay 25% of the cost of tuition at such school, up to a maximum of $500 per child per year.

"(c) The WIFE shall not enroll the CHILDREN in any school, college, graduate school or other institution, summer camp, special training such as music and art or comparable activities, or programs for education or travel without the consent of the HUSBAND, which consent shall not be unreasonably withheld."

In 1975 the separation agreement was significantly amended, changing custody from defendant to plaintiff. The above-quoted provisions concerning education were left intact. The separation agreement as amended was incorporated in the divorce decree. Defendant acknowledges that it is still her obligation under clause (b) to bear the greater share of the financial burden of the children's education. It must be concluded that the transfer of custody now precludes the husband from changing the place or kind of education of the children, without the consent of the wife. Clause (c) must be so read in the light of the custody change. Plainly, clause (a) continued the requirement for joint consultation on all important decisions relating to the children's education. The agreement admits of no other reasonable interpretation.

Up until 1979 the children received a Jewish "day school" education, which consisted of intensive religious training in the Orthodox Jewish tradition combined with complete and regular secular education, on a full-time basis. In November, 1979, plaintiff, without the knowledge or consent of defendant, removed the children from the Hebrew Youth Academy of Essex County, in West Caldwell, New Jersey, and enrolled them in public schools in West Orange.

In the course of continuing litigation over custody, visitation, support, consultation, etc., defendant made an omnibus motion in 1980 which sought, as pertinent to this

appeal, to force plaintiff to re-enroll the children in an Orthodox Jewish school providing full-time secular as well as religious education. Defendant concedes her continuing obligation to pay her agreed-upon share of the tuition, notwithstanding the change in custody. In deciding this aspect of the motion, Special Term noted plaintiff's concession that he was in violation of this portion of the agreement. This stands undisputed. However, Special Term directed plaintiff to enroll the children "in a Jewish religious school that is supplemental to their public education to consult with defendant as to the selection thereof (see paragraph seventh (a) of the original agreement) and permit their attendance until both of the children shall attain their jewish ceremonial Bar Mitzvah."

This order overlooked or misinterpreted the agreement in two crucial respects. In the first place, Special Term's ruling that the children should attend such a school only until their Bar Mitzvah (normally at age 13) is clearly at variance with the explicit language of the agreement which calls for appropriate religious training "until the completion of the 12th grade."

Second, the intention of the parties with regard to the specific type of school the children were to attend is clear from the agreement, when read in accordance with the principle of *ejusdem generis.* Moreover, it is not really in dispute. Special Term read the terms "yeshivah" and "school providing Jewish religious training" as alternatives. However, the use of this terminology, especially in light of the realities of the children's educational background up until that time, makes it clear that the phrase "school providing Jewish religious training" was intended to be parallel to, and explanatory of, the term "yeshivah". It is undisputed that these children have been educated for a number of years in a Jewish day school milieu, with a combined rigorous secular and religious curriculum which cannot be analogized with the limited type of after-school Jewish education that is merely supplemental to a public education. It is in this context that the provisions of clause (b) of paragraph SEVENTH of the agreement must be read.

In its traditional sense, a yeshivah is an institution for the pursuit of talmudic studies (see 16 Encyclopaedia Ju-

daica, p 762ff.). In modern context, "yeshivah" education in America up through the 12th grade often takes the form of the full-time Jewish day school, a Jewish parochial school. It is in this context that Webster's Third International Dictionary defines "yeshivah" as "a Hebrew-English day school providing both secular and religious instruction". This full-time school differs substantially from the week-day afternoon supplemental Hebrew school providing limited training for several hours per week.[1]

Although not part of the record on this appeal, an affidavit submitted in the continuing litigation between these parties is most illuminating on this subject of comparative religious training. Approximately one year after plaintiff removed the children from Hebrew Youth Academy, at about the time that defendant was noticing the instant appeal, plaintiff approached the rabbi of a nearby Orthodox Jewish congregation in New Jersey where members of plaintiff's family are affiliated, inquiring about the availability of supplemental Hebrew school education for his children. The rabbi's affidavit reads in part as follows:

"After inquiring into the children's background of Jewish education, and finding that they have had almost seven and almost five years of yeshivah education, respectively, in which they studied both Jewish as well as secular subjects, full-time, I have come to the conclusion that my school (or any other similar school, providing only a few hours a week of Jewish education) is not the most suitable for these two boys. They have each reached a level of Jewish education beyond the ones provided by my school.

"It is my opinion therefore, as an educator and as an ordained Rabbi of the Jewish faith, that the best interests of the children will be served only by the continuation of their studies in a yeshivah, or full-day school where both Jewish, religious studies as well as secular subjects are taught, as they had been attending from the very beginning of their schooling until November 1979."

1. For an extensive comparison between Jewish day school education and Jewish religious training supplemental to public education, see Schiff, Jewish Day Schools in the United States, Encyclopaedia Judaica (1974 Year Book, p 137ff.). (Dr. Alvin I. Schiff is executive vice-president of the Board of Jewish Education of Greater New York, and an authority on Jewish education in America.)

As the rabbi recognized in recommending against enrollment of the children in his own school, the best interests of the children are of paramount concern (see *Friederwitzer v Friederwitzer,* 55 NY2d 89). Indeed, this court has recently reaffirmed the established principle that separating parents in this State may validly contract to have their children raised in observance of a particular religious lifestyle, so long as the agreement is in the best interests of the children (*Perlstein v Perlstein,* 76 AD2d 49).

With the validity of the agreement and the intention of the parties established, it becomes the task of the court to determine whether the transfer of the children from the yeshivah to public schools was in their best interests. It should be emphasized that a crucial issue in *Perlstein* involved the justification of one of the parents in removing the child from a designated religious school (76 AD2d, at p 55), precisely the issue here. We there held that the party in breach of the agreement should bear the burden of demonstrating that adherence to the agreement would be detrimental to the interests of the child. Plaintiff has not borne that burden here.

Plaintiff argued in Special Term that a psychologist had testified that continuation of the children at Hebrew Youth Academy, where they were enrolled after plaintiff moved to New Jersey, would be detrimental to them. However, that psychologist, Dr. Richard S. Klein, did not address the relative merits of a Jewish day school education vis-à-vis a public education. His testimony was related primarily to the children's welfare at Hebrew Youth Academy. On the other hand, defendant has never asked that the children be returned to that specific school. Rather, she merely insists that the children be returned to the intensive type of Jewish education to which they had become accustomed, and to which the parties had agreed in 1974.

Dr. Klein was psychological consultant to Hebrew Youth Academy, as well as to day schools and public schools in other communities in northern New Jersey. His normal procedure, as part of the enrollment process, was to meet with all new students of the academy and their parents. Follow-up consultations would then be conducted as needed. In this case, in addition to meetings with the

children, the screening process consisted of a meeting with plaintiff and his second wife rather than a meeting with both parents of the children. Dr. Klein conceded that he was neither employed nor otherwise compensated by the school, but rather was paid for his consultative services directly by the parent (in this case, plaintiff).

In his interviews with the children, Dr. Klein found them to be anxious and preoccupied over the custody litigation between their parents. These problems were manifest in the work and behavior of the children in school, in the form of problems with peers, and organization and timely submission of school work. The problems noted were somewhat greater with the younger child, which was consistent with his prior record at Manhattan Day School. The younger child was bright, had a pleasant personality, was socially oriented, but was not driven academically as much as his older brother, and simply was not working up to his ability. It is interesting to note that Dr. Klein's contact with the children since their transfer to public schools revealed that the younger child was still experiencing work-habit problems.

Dr. Klein agreed with plaintiff's withdrawal of the children from Hebrew Youth Academy, premised upon plaintiff's opinions as to a "negative input" there which was detrimental to them. A change of environment to another school, he felt, would be healthy. He found that even though both children liked the Hebrew Youth Academy, especially its religious aspect, they apparently had a great deal of difficulty in the secular part. Dr. Klein conceded that the school faculty did not manage behavioral problems as well as it could have.

While Dr. Klein's testimony may have indicated the desirability of a change in particular schools, his testimony does not support any contention that it was the religious aspect of Hebrew Youth Academy that was detrimental to the children. Indeed, no such argument was made by plaintiff at Special Term. On the contrary, Dr. Klein's testimony seemed to support the fact that the children were more comfortable in a religious milieu. He testified that yeshivah students "usually come from an orthodox background and so they have been oriented toward this

type of school all of their lives and are very comfortable in that environment" (i.e., small enrollment, "family" atmosphere, with all the children knowing all the teachers).

Although the issue of custody is not before us, we note that Dr. Klein found, in his interviews with the children, that they were comfortable with either parent, but if forced to make a decision between the two, they would slightly prefer living with their mother, in part because their mother was "a more observant Jew than the father", and all of their religious friends were in New York City, in their mother's neighborhood. It is manifest that whatever problems the children may have had at Hebrew Youth Academy, it was not the orthodox educational training that the children disliked or found difficult. The testimony reveals that only this particular school, with its apparent inability to handle the children's individual behavioral problems, was unsuited for them.

There is absolutely nothing in the record to support a premise that any other full-time Jewish school would be detrimental. The record points to the contrary. In an affidavit at Special Term, defendant stated that the children had expressed their desire on many occasions to return to Jewish schools. They were especially concerned about not being properly prepared for their forthcoming Bar Mitzvahs.

In contradistinction to the dearth of evidence in the record to support the possibility that yeshivah or day school education was detrimental, defendant had the children examined in September, 1980 by Dr. Jacob Mermelstein, a school psychologist who is accredited both professionally and professorially in New York and New Jersey, and also has had experience with children both in public schools and in private day schools. He found the older child to be emphatic about religious conflicts with his father and his father's new wife, expressing a strong wish to return to a yeshivah education. Although the older child admitted that the Hebrew Youth Academy had not been to his liking, he did express a desire to attend a yeshivah, mentioning by name other such New Jersey schools in the metropolitan area. The younger child was found to be somewhat less serious than his older brother, but basically

in agreement with his older brother concerning preferences in school and religious life-style. In recommending resumption of the children's yeshivah education, Dr. Mermelstein concluded: "It is thus my opinion that stability be preserved, and that the children be granted their wish to continue their education in the manner they had become accustomed to from the very beginning of their schooling until November 1979. Being well versed with both public school and Hebrew Day School education, it is clear to me that we are dealing with far more than curricular differences. What is involved is the aquisition [*sic*] of styles of life, traits, attitudes and beliefs. Preservation of these is in the vital interest of the children concerned."

Only on this appeal has plaintiff alluded for the first time to the advantage of enrolling the children in public school as opposed to any yeshivah. Plaintiff argues that with Hebrew Youth Academy out of the picture, the nearest yeshivah is about an hour's bus ride away. Aside from the fact that the older child was himself able to name other day schools in the area which he would like to attend, we can take notice of the fact that the metropolitan New York area (including northern New Jersey) contains a great many full-time yeshivahs and Jewish day schools. The belated argument that the children will have to commute to school by bus cannot be viewed as a serious obstacle.

A remand for the purpose of determining the best interests of the children is not required here. The evidence in the record fails to support the notion that a yeshivah education, per se, will be detrimental to these children, and indeed plainly supports the view that such an education, if not necessarily at Hebrew Youth Academy of Essex County, is in their best interests. The desires of the children, as made known to the two psychologists, would appear to bear this out.

In matters related to custody, the desires of the children must be accorded serious consideration. However, such desires are plainly not dispositive (*Friederwitzer v Friederwitzer*, 55 NY2d 89, 95, *supra; Matter of Nehra v Uhlar,* 43 NY2d 242, 249; *Dintruff v McGreevy,* 34 NY2d 887, 888-889). As *Friederwitzer* holds, the best interests of the child control. Under the circumstances of this case, where the

language of the agreement respecting the education of the children is crystal clear and the desires of the children are consistent with that language, no reason appears why the provisions of the contract should be ignored (*Friederwitzer v Friederwitzer, supra*).

In summary, the qualitative difference between a yeshivah or day school education and Jewish studies which are merely supplemental to a public education, especially in light of the educational background of these children until 1979, makes possible only one reasonable reading of the intention of the parties in the agreement. The best interests of these children dictate their return to a yeshivah or Jewish day school acceptable to the parents, in time for the start of the next school term,[2] and their remaining in such an educational environment through the 12th grade.

Accordingly, the order, Supreme Court, New York County (GOMEZ, J.), entered November 19, 1980, should be reversed, on the law and the facts, to the extent appealed from, without costs; it should be directed that each of the children, at the start of the next school term, be enrolled in a full-time yeshivah or Jewish day school to be agreed upon by the parties, and that the children attend such a school through completion of the 12th grade.

SANDLER, J. P., LUPIANO, BLOOM and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on November 19, 1980, unanimously reversed, on the law and the facts, to the extent appealed from, without costs and without disbursements, and it is directed that each of the children, at the start of the next school term, be enrolled in a full-time yeshivah or Jewish day school to be agreed upon by the parties, and that the children attend such a school through completion of the 12th grade.

---

2. At oral argument this court was advised that the older child has since been returned to a full-time Jewish educational institution.