[60 NYS3d 265]

NAFTALI H. WEISBERGER, Respondent, v CHAVA WEISBERGER, Appellant.

Second Department, August 16, 2017

**APPEARANCES OF COUNSEL**

*Seward & Kissel LLP*, New York City (*Mark D. Kotwick, Benay L. Josselson, Julia K. Tebor* and *Tamara Rozina* of counsel), and *New York Legal Assistance Group*, New York City (*Kim Susser* and *Amanda Beltz* of counsel), for appellant (one brief filed).

*Snitow Kanfer & Holtzer, LLP*, New York City (*Franklyn H. Snitow* and *Alan V. Klein* of counsel), for respondent.

*Cheryl S. Solomon*, Brooklyn, Attorney for the Children.

*Lambda Legal Defense and Education Fund, Inc.*, New York City (*Karen L. Loewy* of counsel), for Lambda Legal Defense and Education Fund, Inc., amicus curiae.

*New York Civil Liberties Union Foundation*, New York City (*Erin Beth Harrist* and *Arthur Eisenberg* of counsel), for New York Civil Liberties Union Foundation, amicus curiae.

*Fried, Frank, Harris, Shriver & Jacobson LLP*, New York City (*Jennifer L. Colyer* and *Jesse R. Loffler* of counsel), for Footsteps, Inc. and another, amici curiae.

### OPINION OF THE COURT

Per Curiam.

The parties were married on March 5, 2002. In 2005, the mother told the father that she could not tolerate having sexual relations with men, and that she was sexually attracted to women. The parties were divorced by a judgment of divorce dated March 6, 2009. They have three children together, a son and two daughters. At the time of the divorce, the parties' older daughter was five years old, their son was three years old, and their younger daughter was two years old. In a stipulation of settlement dated November 3, 2008, which was incorporated but not merged into the judgment of divorce, the parties agreed to joint legal custody of the children with the mother having primary residential custody. The parties agreed that the father's visitation with the children would consist of a two-hour period once per week after school (to be increased to twice per week with respect to their son when he turned eight years old, for the purpose of religious study); overnight visitation every other Friday after school until Saturday evening for the observance of Shabbos (the Sabbath); for two consecutive weeks every summer; and an alternating schedule for holidays. Central to the issues raised on appeal, the stipulation contained the following religious upbringing clause:

> "Parties agree to give the children a Hasidic upbringing in all details, in home or outside of home, compatible with that of their families'. Father shall decide which school the children attend. Mother to insure that the children arrive in school in a timely manner and have all their needs provided."

The stipulation of settlement further provided that each party "shall be free from interference, authority and control, direct or indirect, by the other."

On November 29, 2012, more than three years after the divorce, at which time the children were nine, seven, and five years old, respectively, the father moved, by order to show cause: (1) to modify the stipulation of settlement so as to award him sole legal and residential custody of the children, as well as final decision-making authority over medical and dental issues, and issues of mental health; (2) to modify the stipulation of settlement so as to award the mother only supervised therapeutic visitation with the children; (3) to enforce the religious upbringing clause so as to require the mother to direct the children to practice full religious observance in accordance with the Jewish Hasidic practices of ultra Orthodoxy at all times and require her to practice full religious observance in accordance with the Hasidic practices of ultra Orthodoxy during any period in which she has physical custody of the children and at any appearance at the children's schools; and (4) for such other and further relief as the court deemed just and proper.

In support of the motion, the father alleged that the mother had radically changed her lifestyle in a way that conflicted with the parties' religious upbringing clause. Although the father acknowledged that at the time he entered into the stipulation of settlement he expected the mother's future intimate relationships would be with women, he expected her to keep the fact that she was gay a secret and to keep any relationship she had with a woman secret from the children. The father alleged that since the parties had entered into the stipulation of settlement the mother had, among other things, come out publicly as a lesbian, disparaged the basic tenets of Hasidic Judaism in front of the children, allowed the children to wear non-Hasidic clothes, permitted them to violate the Sabbath and kosher dietary laws, and referred to them by names that were not traditionally used in the Hasidic community. The father further alleged that the mother had dressed immodestly, dyed her hair, and permitted a transgender man to reside in her home with the children.

Pending the hearing and determination of the father's motion, the Supreme Court awarded him temporary residential custody of the children. On December 5, 2012, the parties entered into a temporary order of visitation on consent, provid-

ing that the children would reside with the mother from Monday to Thursday, and with the father from Thursday to Monday, with the mother having additional access to the children on alternate Sundays from 3:00 p.m. to 6:00 p.m. The temporary order also provided, inter alia, that the mother would "encourage and practice full religious observance in accordance with the [Hasidic] practices of Emunas Yisroel in the presence of the children," and "in the Boro Park community, the [mother] shall dress in the [Hasidic] modest fashion."

The mother opposed the father's motion and separately moved, by notice of motion dated April 10, 2013, inter alia, to modify the religious upbringing clause and for such other and further relief as the court deemed just and proper. The mother proposed that the religious upbringing clause be modified to provide as follows:

> "Mother agrees to provide the children with a conservative or progressive modern orthodox Jewish upbringing compatible in all details, in home or outside of home, with a conservative or progressive modern orthodox Jewish community that is inclusive of gay individuals. Such community shall be as near to Borough Park, Brooklyn, New York, as possible, and in [sic] under no circumstances outside of the Borough of Brooklyn. The children will attend a conservative or progressive modern orthodox Jewish school that is similarly inclusive. Mother and Father shall consult with one another on selecting the Children's schools. Father shall continue to teach the Children all aspects of a Hasidic upbringing, and in furtherance of this shall have visitation rights with the children every Shabbos, beginning Friday night one hour before sundown through Sunday morning at 10 am. Mother will keep a [k]osher home and shall only provide the Children kosher food outside of her home. Mother to insure that the children arrive in school in a timely manner and have all their needs provided."

The mother also sought to modify the stipulation of settlement's provision for alternating visitation on holidays to provide, inter alia, that the father would have the children during all Jewish holidays and the mother would have the children during all nonreligious school vacations, with the exception of two weeks each summer to be spent with the father.

The Supreme Court held a hearing for the purpose of deciding both motions, and heard testimony from, among others, the father and the mother. The father testified that his and the mother's extended families were integrally involved in the founding of the Emunas Yisroel branch of Orthodox Hasidic Judaism, and their families were neighbors in Monsey, New York. When the parties were both 19 years old, they were introduced through a shadchan (matchmaker). Shortly thereafter, they became engaged and, in 2002, they were married.

After marrying, the parties moved to Boro Park, Brooklyn, so that the father could pursue religious studies. They had three children, and raised them according to traditional Hasidic practices and beliefs. During the marriage, the father left the house in the morning and generally returned after the children were in bed. The mother was primarily responsible for taking care of the children's needs, and the father was satisfied with her care of them. The parties kept a strictly kosher home, spoke Yiddish, observed the Sabbath, and always wore traditional clothing. According to the father, Hasidic children never wear T-shirts, jeans, or shorts, boys do not have their hair cut until the age of three, and there is no television or Internet in the home.

The father testified that at some point during their marriage the mother informed him that she did not enjoy sexual relations with men, and that she was attracted to women. Notwithstanding her feelings, the mother continued to live a Hasidic lifestyle. The father eventually agreed to give the mother a Get (a Jewish divorce), and, on November 3, 2008, the parties entered into the stipulation of settlement containing the religious upbringing clause at issue on this appeal. The father testified that he had expected the mother to keep her religious beliefs and her sexuality a secret from the children and from the community, although the stipulation of settlement did not explicitly require her to do so. The father acknowledged that the stipulation of settlement required him to make child support payments to the mother in the total amount of $600 per month, which sum was to cover his total monthly obligations with respect to all three of the parties' children.

The parties were divorced on March 6, 2009, and the father married a different woman later that same month. At the time of his testimony, the father and his new wife had two children together. Despite the parties' agreement that the father would have visitation with the children every other Shabbos, the

father testified that during the first 18 months of his new marriage he would not permit the children to come over to his house, he did not fully exercise his biweekly right to visitation during Shabbos, and he did not take their son for Yom Kippur in 2009 through 2011. The father testified that when he did visit with the parties' children, he did so at his parents' house.

The father learned that in fall 2012 a transgender man (hereinafter O.) moved into the mother's home, and that a curtain was installed to separate the adult bedrooms from the children's bedrooms. According to the father, his children informed him that O. assisted in bathing them and told them about sexual parts of the human body. In October 2012, the mother began dressing the children in secular clothes and cut their son's payos (sidelocks). The father testified that the children began speaking English in school, stopped saying blessings at meals and nighttime prayers, and were eating non-kosher food. Further, the father testified that the mother had allowed the children to ride a train and use light switches on the Sabbath. The father also testified that the mother allowed the children to watch movies, including a movie about Christmas, and participate in an egg hunt at a Purim party. The father testified that in March 2013, the younger daughter told him that she had read a book about children with two fathers and other books about homosexuality.

The father denied that the mother's sexual orientation was the motivation behind his request for a change in custody; however, he had expected the mother to keep her sexual orientation a secret from the children. The father testified that he sought custody of the children so that he could give them a traditional upbringing according to his religion without interference from the mother. The father objected to the children being exposed to anyone who was openly nonreligious, or to any intimate relationship that was not sanctioned by Jewish law. The father believed that homosexuality violated the Torah. The father also believed that the mother's visits with the children should be limited to one or two hours per week and supervised by a family member. When asked whether he could reach a compromise, the father testified: "[T]here's no place for compromising in our religion."

The mother testified that the parties' move to Boro Park was difficult for her because she did not have a community network. Approximately one year into their marriage, at a time before the mother identified as gay, the mother began seeing a

therapist regarding her attraction to women. After several attempts at marriage counseling, the mother eventually came to the conclusion that she wanted a divorce. She never spoke with a lawyer during the divorce process. Her father-in-law gave her an agreement to review and make notes. She met with a rabbi, who guided her as to which issues she should negotiate. She negotiated the financial aspects of the agreement and, according to her testimony, Rabbi Glassman—the parties' designated mediator—was supposed to incorporate her changes into the agreement. When she appeared at the Beth Din to sign the agreement, it did not include her changes. She inquired why the agreement did not include the changes and the mediator said he would take care of it, so she signed the agreement. The stipulation of settlement provided that the father would pay the mother $600 per month in child support. The mother waived her right to, among other things, maintenance and to the distribution of marital property. The mother testified that she believed the custody arrangement provided for in the stipulation of settlement was good for the children. However, the mother noted that the father had not made a single child support payment to her since their separation, notwithstanding the explicit terms of the stipulation of settlement.

After the divorce, the mother brought the older children to therapy at the Jewish Board of Family and Children's Services, and later enrolled the older daughter in group therapy for children from divorced families, which she believed had positive benefits on the children. The mother testified that even while married she was never as strict as the father regarding blessings, washing rituals, prayers, and exposure to secular books and ideas. For a number of years, the mother never told the children about her sexual orientation. However, the mother testified that, in 2012, she learned that the older daughter was beginning to suspect the mother was gay. The mother testified that she consulted with the older daughter's therapist about the issue, and then told the older daughter that she was gay, which she believed deepened the child's level of trust and openness with her. In September 2012, the mother's friend, O., came to live with her. The children and O. got along well with each other. However, in October 2012, after the older daughter returned from a visit with the father, she was confused and upset because the father's family had teased her about her level of religious observance and had told her

that O. was really a woman. After the December 5, 2012, temporary order of visitation was entered, and the children began spending half of the week with the father, the mother found the children would often be upset and confused. The mother testified that she carefully obeyed the order's provision requiring her to behave religiously with the children and in Boro Park, but felt hypocritical for doing so and for hiding parts of herself. She believed the father's custody proposal was devastating, as she had been the most present parent in the children's lives since they were born, and she worried about the children's emotional well-being while in the father's custody. In connection with her motion to modify the religious upbringing clause, the mother believed the children would be better served by attending a school that was more accepting of diversity, and she offered to continue to keep a kosher home and let the children spend religious holidays with the father. The mother wanted the children to continue with therapy to help them resolve the differences between their two parents' households.

In the order appealed from, the Supreme Court determined that there had been a change of circumstances caused by the mother's transition from an ultra Orthodox Hasidic lifestyle to a "more progressive, albeit Jewish, secular world." The court noted that the mother's conduct was in conflict with the parties' agreement, which "forbade living a secular way of life in front of the children or while at their schools." The court posited that had there been no agreement it might have considered the parties' arguments differently; however, "given the existence of the Agreement's very clear directives, [the] Court was obligated to consider the religious upbringing of the children as a *paramount factor* in any custody determination" (emphasis added).

The Supreme Court granted that branch of the father's motion which was to modify the stipulation of settlement so as to award him sole legal and residential custody of the children, as well as final decision-making authority over medical and dental issues, and issues of mental health, with supervised therapeutic visitation to the mother. The court stayed the provision of the order limiting the mother's visitation to supervised therapeutic visits, conditioned upon, inter alia, her compliance with the religious upbringing clause contained in the stipulation of settlement. The court directed that, while the stay was in effect, the mother was entitled to unsupervised visitation every Monday after school or camp until Thursday morning.

In addition, the Supreme Court granted that branch of the father's motion which was to enforce the religious upbringing clause so as to require the mother to direct the children to practice full religious observance in accordance with the Hasidic practices of ultra Orthodoxy at all times. Further, the court ordered that during any period of visitation or during any appearance at the childrens' schools "the [mother] must practice full religious observance in accordance with the Hasidic practices of ultra Orthodoxy." The court denied those branches of the mother's motion which were to modify the religious upbringing clause and to modify the vacation and holiday schedule contained in the stipulation of settlement. The mother appeals.

" 'Modification of an existing court-sanctioned custody or visitation arrangement is permissible only upon a showing that there has been a change in circumstances such that a modification is necessary to ensure the continued best interests and welfare of the child[ren]' " (*Matter of Spencer v Killoran*, 147 AD3d 862, 863 [2017], quoting *Matter of O'Shea v Parker*, 116 AD3d 1051, 1051 [2014]; *see Matter of Bodre v Stimatz*, 150 AD3d 1228, 1229 [2017]). "The best interests of the child[ren] must be determined by a review of the totality of the circumstances" (*Matter of Preciado v Ireland*, 125 AD3d 662, 662 [2015]; *see Eschbach v Eschbach*, 56 NY2d 167, 171-172 [1982]; *Matter of Boggio v Boggio*, 96 AD3d 834, 835 [2012]).

> "Factors to be considered include the quality of the home environment and the parental guidance the custodial parent provides for the child[ren], the ability of each parent to provide for the child[ren]'s emotional and intellectual development, the financial status and ability of each parent to provide for the child[ren], the relative fitness of the respective parents, and the effect an award of custody to one parent might have on the child[ren]'s relationship with the other parent" (*Mohen v Mohen*, 53 AD3d 471, 473 [2008] [internal quotation marks omitted]; *see Matter of Moran v Cortez*, 85 AD3d 795, 796 [2011]).

Additionally, to the extent the mother's sexual orientation was raised at the hearing, we note that courts must remain neutral toward such matters, such that the focus remains on the continued best interests and welfare of the children (*see In re Marriage of Black*, 188 Wash 2d 114, 130, 392 P3d 1041, 1049-

1050 [2017]; *see also Matter of Paul C. v Tracy C.*, 209 AD2d 955, 956 [1994]; *Anonymous v Anonymous*, 120 AD2d 983, 983-984 [1986]; *Guinan v Guinan*, 102 AD2d 963, 964 [1984]; *Di Stefano v Di Stefano*, 60 AD2d 976, 977 [1978]).

Since weighing the factors relevant to any custody determination

> "depends to a very great extent upon the hearing court's assessment of the credibility of the witnesses and of the character, temperament, and sincerity of the parties, its findings are generally accorded great respect and will not be disturbed unless they lack a sound and substantial basis in the record, or are contrary to the weight of the evidence" (*Trinagel v Boyar*, 70 AD3d 816, 816 [2010]; *see Matter of Selliah v Penamente*, 107 AD3d 1004, 1004 [2013]; *Matter of Jackson v Coleman*, 94 AD3d 762, 763 [2012]).

Nonetheless, this Court's authority in custody and visitation matters is as broad as that of the hearing court,

> "and while we are mindful that the hearing court has an advantage in being able to observe the demeanor and assess the credibility of witnesses, we 'would be seriously remiss if, simply in deference to the finding of a Trial Judge,' we allowed a custody determination to stand where it lacks a sound and substantial basis in the record" (*Matter of Caruso v Cruz*, 114 AD3d 769, 772 [2014], quoting *Matter of Gloria S. v Richard B.*, 80 AD2d 72, 76 [1981]; *see Matter of James A.-S. v Cassandra A.-S.*, 107 AD3d 703, 706 [2013]; *Matter of Moran v Cortez*, 85 AD3d 795, 796-797 [2011]).

Here, both parties contend that there has been a change in circumstances warranting modification of the stipulation of settlement. We conclude that the record supports the Supreme Court's determination that a change of circumstances has occurred, such that a modification of the stipulation of settlement is necessary to ensure the continued best interests and welfare of the children (*see Matter of Pagan v Gray*, 148 AD3d 811, 812 [2017]; *Matter of Oyefeso v Sully*, 148 AD3d 710, 712 [2017]).

However, the Supreme Court's determination to modify the stipulation of settlement so as to award the father sole legal and residential custody of the children, as well as final decision-

making authority over medical and dental issues, and issues of mental health, with supervised therapeutic visitation to the mother, lacked a sound and substantial basis in the record (*see Matter of Caruso v Cruz*, 114 AD3d at 773; *Matter of James A.-S. v Cassandra A.-S.*, 107 AD3d at 706). In pertinent part, the court gave undue weight to the parties' religious upbringing clause, finding it to be a "paramount factor" in its custody determination. "When presented as an issue, religion may be considered as one of the factors in determining the best interest of a child, although it alone may not be the determinative factor" (*Aldous v Aldous*, 99 AD2d 197, 199 [1984]). "New York courts will consider religion in a custody dispute when a child has developed actual religious ties to a specific religion and those needs can be served better by one parent than the other" (*id.* at 199; *see Matter of Gribeluk v Gribeluk*, 120 AD3d 579, 579 [2014]). However, clauses in custody agreements that provide for a specific religious upbringing for the children will only be enforced so long as the agreement is in the best interests of the children (*see Karetny v Karetny*, 283 AD2d 250 [2001]; *Spring v Glawon*, 89 AD2d 980, 981 [1982]; *Gruber v Gruber*, 87 AD2d 246, 250 [1982]; *Garvar v Faltings*, 54 AD2d 971 [1976]). "No agreement of the parties can bind the court to a disposition other than that which a weighing of all of the factors involved shows to be in the child[ren]'s best interest" (*Friederwitzer v Friederwitzer*, 55 NY2d 89, 95 [1982]; *see Eschbach v Eschbach*, 56 NY2d at 171).

Considering all of the facts and circumstances of this case, the father failed to demonstrate that it is in the children's best interests to award him sole legal and residential custody of the children, as well as final decision-making authority over medical and dental issues, and issues of mental health. The mother has been the children's primary caretaker since birth, and their emotional and intellectual development is closely tied to their relationship with her. The record overwhelmingly demonstrates that the mother took care of the children's physical and emotional needs both during and after the marriage, while it is undisputed that the father consistently failed to fully exercise his visitation rights or fulfill his most basic financial obligations to the children after the parties' separation. Indeed, aside from objecting to her decision to expose the children to views to which he personally objects, the father expressed no doubts whatsoever about the mother's ability to care and provide for the children. The weight of the evidence

established that awarding the father full legal and residential custody of the children with limited visitation to the mother would be harmful to the children's relationship with her (*see Bliss v Ach*, 56 NY2d 995, 998 [1982]). Furthermore, "[s]upervised visitation is appropriately required only where it is established that unsupervised visitation would be detrimental to the child[ren]" (*Matter of Gainza v Gainza*, 24 AD3d 551, 551 [2005]). Here, there was no showing that unsupervised visitation was detrimental to the children and, as discussed more fully below, it was wholly inappropriate to use supervised visitation as a tool to compel the mother to comport herself in a particular religious manner.

Furthermore, the Supreme Court improperly directed that enforcement of the parties' stipulation of settlement required the mother to practice full religious observance in accordance with the Hasidic practices of ultra Orthodoxy during any period in which she has physical custody of the children and at any appearance at the children's schools. Although the court accepted the father's argument that the religious upbringing clause "forb[ids] [the mother from] living a secular way of life in front of the children or while at their schools," the plain language of the parties' agreement was "to give *the children* a Hasidic upbringing" (emphasis added). The parties' agreement does not require the mother to practice any type of religion, to dress in any particular way, or to hide her views or identity from the children. Nor may the courts compel any person to adopt any particular religious lifestyle (*see Lee v Weisman*, 505 US 577, 587 [1992]; *see also Lemon v Kurtzman*, 403 US 602, 612-613 [1971]). To the contrary, "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise" (*Lee v Weisman*, 505 US at 587). Thus, a religious upbringing clause should not, and cannot, be enforced to the extent that it violates a parent's legitimate due process right to express oneself and live freely (*see Lawrence v Texas*, 539 US 558, 574 [2003] [" 'At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life' " (quoting *Planned Parenthood of Southeastern Pa. v Casey*, 505 US 833, 851 [1992])]; *see also Obergefell v Hodges*, 576 US —, 135 S Ct 2584 [2015]). Indeed, the parties themselves agreed in the stipulation of settlement that they "shall [each] be free from interference, authority and control, *direct or indirect*, by the other" (emphasis added).

While we respect the parties' right to agree to raise their children in a chosen religion and to seek judicial relief to enforce that right, given the change in circumstances here, the weight of the evidence does not support the conclusion that it is in the children's best interests to have their mother categorically conceal the true nature of her feelings and beliefs from them at all times and in all respects, or to otherwise force her to adhere to practices and beliefs that she no longer shares. There is no indication or allegation that the mother's feelings and beliefs are not sincerely held, or that they were adopted for the purpose of subverting the religious upbringing clause, and there has been no showing that they are inherently harmful to the children's well-being.

This is not to say that it would be in the children's best interests to become completely unmoored from the faith into which they were born and raised. Indeed, we conclude that the children's best interests would be better served by a more limited modification of the religious upbringing clause than that proposed by the mother. The evidence at the hearing established that the children have spent their entire lives in the Hasidic community, they attend Hasidic schools, and their extended families are Hasidic. "[T]he maintenance of the status quo is a positive value which, while not decisive in and of itself, is entitled to great weight" (*Matter of Moorehead v Moorehead*, 197 AD2d 517, 519 [1993]). Contrary to the mother's contention, the weight of the evidence demonstrates that it is in the children's best interests to continue to permit the father to exercise final decision-making authority over the children's education and to continue to permit him to require the children to practice full religious observance in accordance with the Hasidic practices of ultra Orthodoxy while they are in his custody, or in the custody of a school that requires adherence to such practices. To this end, the children's interests will be best served if their parents work together to surmount the challenges the children will face as they continue on their current educational path. As such, we deem it appropriate to direct the mother to make all reasonable efforts to ensure that the children's appearance and conduct comply with the Hasidic religious requirements of the father and of the children's schools while the children are in the physical custody of their father or their respective schools. Further, in light of the mother's proposal, made in both her motion papers and her testimony, to keep a kosher home and to provide the children

exclusively with kosher food, we find that it would be in their best interests for her to do so, and in a manner consistent with Hasidic practices. Except for these specified matters, we otherwise modify the religious upbringing clause to allow each parent to exercise his or her discretion while the children are in his or her care or custody.

We find that an increased visitation schedule with the father would be in the children's best interests. The parties' original custody agreement provided the father with, inter alia, one overnight visit with the children, every other week. In light of the change in circumstances, we conclude that the stipulation of settlement does not adequately provide the father with meaningful time with the children (see *Chamberlain v Chamberlain*, 24 AD3d 589, 593 [2005]). Accordingly, that branch of the father's motion which was to modify the stipulation of settlement is granted only to the extent of modifying the stipulation of settlement so as to award the father visitation every other weekend from Thursday after school until Sunday at 11:00 a.m. On alternating weeks, the father shall have (as the parties provided in their stipulation of settlement) visitation from Friday after school and return them one hour after Shabbos ends during winter and two hours after Shabbos ends during summer.

Further, we find the mother's proposal to allow the father to have physical custody of the children during Jewish holidays and for the mother to have physical custody of the children during nonreligious school vacations would be in the children's best interests. Accordingly, we grant that branch of the mother's motion which was to modify the vacation and holiday schedule contained in the stipulation of settlement so as to award the father visitation during all Jewish holidays and for two weeks during summer vacation, and to award the mother visitation during all nonreligious school vacations, with the exception of the two weeks each summer to be spent with the father. All other provisions for visitation in the stipulation of settlement remain unchanged.

We acknowledge that both parents are sincere in their devotion to the children and, with the exception of occasional lapses in good judgment, neither parent has engaged in conduct that is contrary to the best interests of the children. And yet, the parties' religious, moral, and ethical beliefs and values with respect to raising their children, while once compatible, have now become incompatible in many important respects. While

the arrangement set forth here may not fully satisfy both sides of this dispute, courts do not always have the perfect solution for all of the complexities and contradictions that life may bring—the parties must forge a way forward as parents despite their differences. We are confident that both parties will exercise their best judgment in these matters in a manner that furthers the best interests of their children.

Finally, the parties' stipulation provided, inter alia, that the parties shall "encourage the child[ren] to honor, respect and love the other party," shall not "attempt to alienate or destroy the affection of the child[ren] for the other party," and shall not "speak idly about the other party in front of the children." This provision applies equally to both parties and, therefore, neither party may, directly or indirectly, denigrate the other to or before the children for any reason, including their disagreement with the other party's identity or beliefs.

In light of the foregoing, the parties' remaining contentions have been rendered academic.

Accordingly, the order is modified, on the law, on the facts, and in the exercise of discretion, in accordance with the foregoing.

LEVENTHAL, J.P., COHEN, MILLER and CONNOLLY, JJ., concur.

Ordered that the order is modified, on the law, on the facts, and in the exercise of discretion, (1) by deleting the provision thereof granting that branch of the father's motion which was to modify the parties' stipulation of settlement so as to award him sole legal and residential custody of the subject children, as well as final decision-making authority over medical and dental issues, and issues of mental health, with supervised therapeutic visitation to the mother, and substituting therefor a provision granting that branch of the father's motion only to the extent of modifying the stipulation of settlement so as to award him additional visitation every other weekend from Thursday after school until Sunday at 11:00 a.m., and on alternating weeks, from Friday after school until one hour after Shabbos ends during winter and two hours after Shabbos ends during summer, and otherwise denying that branch of his motion, (2) by deleting the provision thereof denying that branch of the mother's motion which was to modify the religious upbringing clause contained in the stipulation of settlement, and substituting therefor a provision granting that branch of the mother's motion to the extent of modifying the religious upbringing clause by: (a) permitting the father to

require the children to practice full religious observance in accordance with the Hasidic practices of ultra Orthodoxy only when they are in the father's custody, or in the custody of a school that requires adherence to such practices, (b) directing the mother to make all reasonable efforts to ensure the children's compliance with the religious requirements of the father and of the children's schools, if any, to the extent that such requirements pertain to the children's appearance and conduct while they are in the physical custody of the father or their respective schools, (c) directing that the mother shall keep a kosher home and shall provide the children exclusively with kosher food in a manner consistent with Hasidic practices, and (d) permitting each parent to exercise his or her discretion while the children are in his or her care or custody, (3) by deleting the provision thereof denying that branch of the mother's motion which was to modify the vacation and holiday schedule contained in the stipulation of settlement so as to award the father visitation during all Jewish holidays and for two weeks during summer vacation, and to award the mother visitation during all nonreligious school vacations, with the exception of the two weeks each summer to be spent with the father, and substituting therefor a provision granting that branch of the mother's motion, and (4) by deleting the provision thereof granting that branch of the father's motion which was to enforce the religious upbringing clause contained in the stipulation of settlement, and substituting therefor a provision denying that branch of the motion as academic in light of our modification of the religious upbringing clause; as so modified, the order is affirmed insofar as appealed from, without costs or disbursements.